Filed 11/21/24  The Regents of the U. of Cal. v. City of Santa Cruz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF SANTA CRUZ, <br><br> Defendant and Respondent. | H050528 <br> (Santa Cruz County <br> Super. Ct. No. 20CV02152) |

## I.  INTRODUCTION

This appeal arises from a dispute between appellant the Regents of the University of California (Regents) and respondent the City of Santa Cruz (City) regarding the City's obligation to supply municipal water to the University of California, Santa Cruz (UC Santa Cruz) under the terms of two agreements that the parties entered into in 1962 and 1965 after the Santa Cruz area was selected as the location for a new University of California campus.

By 2005 the City had become concerned about the growth of the UC Santa Cruz campus and a controversy arose regarding whether the City was obligated to supply water for new campus development, and, in particular, those parts of the campus that were outside City jurisdiction.  After the City failed to confirm that it would supply water under the terms of the parties' agreements, the Regents filed an action against the City seeking declaratory relief and specific performance of City's water service obligations.

The parties each filed a motion for summary judgment, or in the alternative, summary adjudication of the causes of action for declaratory relief and breach of contract—specific performance contending that their interpretation of the extent of the City's water service obligations under the parties' 1962 and 1965 agreements was correct.[1]

The trial court denied the Regents' motion and granted the City's motion, ruling that "the Agreements cannot reasonably be interpreted as contractually obligating the City to provide water for all future development within the Campus boundary, including the new development planned in the North Campus."

The trial court also ruled that the City could not extend water service to the North Campus absent annexation of that part of the campus by the City or approval of the extension of extraterritorial services by the Santa Cruz Local Agency Formation Commission (LAFCO), and LAFCO was the arbiter of whether the Government Code section 56133, subdivision (e)(4) exemption for extended services provided before 2001 applied.[2]  The trial court therefore determined that LAFCO was an indispensable party and the Regents' failure to join LAFCO as a party was fatal to the cause of action for declaratory relief.

The September 30, 2022 judgment dismissed the Regents' second amended complaint with prejudice and entered judgment for the City.  On appeal, the Regents contend that the trial court erred and they are entitled to declaratory relief and specific performance of the City's water service obligations under the Regents' interpretation of the parties' agreements.  The Regents also argue that the trial court erred in ruling that

---

[1] The parties stipulated to bifurcating the third cause of action for breach of contract—damages and to proceed on their motions for summary judgment, or in the alternative summary adjudication of the first cause of action for declaratory relief and the second cause of action for breach of contract—specific performance.

[2] All further statutory references are to the Government Code unless otherwise indicated.

either annexation or LAFCO approval is required before the City can supply water to the entire UC Santa Cruz campus and LAFCO is therefore an indispensable party.

For reasons that we will explain, we agree with the Regents in part.  We will therefore reverse the judgment and remand the matter to the trial court with directions to (1) vacate the September 30, 2022 order denying the Regents' motion for summary adjudication and granting the City's motion for summary adjudication;  (2) enter a new order granting the Regents' motion for summary adjudication of the first cause of action for declaratory relief and denying the Regents' motion for summary adjudication of the second cause of action for breach of contract-specific performance; (3) enter a new order denying the City's motion for summary judgment, or, in the alternative, summary adjudication of the first cause of action for declaratory relief and granting summary adjudication of the second cause of action for breach of contract—specific performance; and (4) enter a new order granting declaratory relief as follows:  Under the terms of the agreement executed on January 8, 1962, and the agreement executed on February 8, 1965, between the Regents of the University of California and the City of Santa Cruz, the City of Santa Cruz is obligated to provide water service to the boundaries of the University of California campus through the City's existing water lines, which may then be used for distribution to any part of the University of California, Santa Cruz campus, including new campus development and those parts of the campus outside the City's jurisdiction, through the campus water infrastructure.

## II.  FACTUAL BACKGROUND

### A.  *The 1962 and 1965 Agreements*

In 1957 the Regents began to plan a new University of California campus that would serve the south central coast area of California.  The City of Santa Cruz wanted the new campus be located in the Santa Cruz area, and made "representations, offers and commitments to induce the University to select Santa Cruz as the location of a general

3

campus." In 1961 the Regents adopted a resolution declaring their intention to establish the new campus in Santa Cruz.

The parties then entered into agreements regarding the development of the new UC Santa Cruz campus. Among them was an agreement executed on January 8, 1962 (the 1962 Agreement). Relevant here, the 1962 Agreement stated that the City would provide municipal services to the UC Santa Cruz campus, including the following: "As may be necessary to provide for campus development, City shall provide, at no expense to University, any and all water lines and sanitary sewer lines up to the boundaries of said Campus Area as good engineering practice and the reasonable needs of the University and of the City may require." The 1962 Agreement further provided that the "City shall make water and sewer services available to the University at rates no less favorable than those prevailing to large-scale industrial users."

The "Campus Area" was described in the 1962 Agreement as comprising 1,994 acres of land that the Regents intended to purchase  Part of the Campus Area property was in an unincorporated area of Santa Cruz County outside City limits, including that portion known as the North Campus. The part of the Campus Area outside the City limits was designated Parcels A, B, and C. In the 1962 Agreement, the City expressly agreed to provide fire and police protection only to the part of the Campus Area lying within City limits, with no such restriction on water service.

The 1962 Agreement also provided that the "City shall participate with the University and the County of Santa Cruz in the preparation and adoption of a University Area Development Plan," which was to be completed by June 1, 1963. The record on appeal does not include a document entitled "University Area Development Plan," but does includes a document entitled "General Plan for the University Environs" dated October 1963.

The parties later executed a February 8, 1965 agreement (the 1965 Agreement) that, among other things, was intended to clarify the municipal water service for the new

4

UC Santa Cruz campus. The 1965 Agreement includes the following paragraph: "The water system to be provided by the City shall be as generally set forth upon the map attached hereto, designated Exhibit 'A' and by this reference incorporated herein.[3] Subject to interruption of service from causes beyond the reasonable control of the City, the system described shall at all times be capable of delivering to the University system in Pressure Zone 4, water at the rate of 3,000 gallons per minute for fire protection . . . ; and the system shall be at all times capable of supplying to University water up to 2,000,000 gallons in twenty-four hours for fire flow and ordinary use." Additionally, the 1965 Agreement provided as follows regarding billing for water service: "University's Parcels A, B, and C, as described in [the 1962 Agreement], and University-owned and operated areas contiguous thereto shall constitute a single area for billing purposes."

The 1965 Agreement also included the following provision regarding annexation: "Annexation. [¶] 1. Any portion or all of said Parcels A and B as designated in Exhibit 'I' of that certain prior Agreement between the parties hereto dated January 8, 1962, shall be annexed to City upon request in writing from either the City or the University, and the City and the University agree not to protest any proceedings for the annexation of such property. [¶] 2. Any portion or all of said Parcel C shall be annexed to the City upon request in writing from the University."

In July 1965 the City adopting a resolution approving the annexation of territory designated "University Annexation No.1," which the City asserts was a portion of Parcel A and Parcel B.

B. *City Water Service to UC Santa Cruz After 1965*

The City completed construction of the infrastructure for delivering water to the campus boundaries between 1965 and 1974. Since that time the City has delivered water

---

[3] It is unclear whether Exhibit A to the 1965 Agreement was included in the record on appeal, since the record includes several maps without an Exhibit A designation.

through its infrastructure, which includes service connections,[4] to the UC Santa Cruz campus. UC Santa Cruz is responsible for distributing the City-supplied water to the entire campus property through its own infrastructure, including the North Campus.

The North Campus has been partially developed with student apartments built in 1968 and portions of Colleges 9 and 10 built in 2002. These existing buildings on the North Campus receive water service from the City.

In 2005 a long range development plan for UC Santa Cruz (2005 LRDP) was prepared to "to guide the physical development of the UC Santa Cruz campus through 2020-21."[5] As this court has noted, the 2005 LRDP "called for a significant expansion of its student population and the addition of 3,175,000 gross square feet of building space." (*Community Water Coalition v. Santa Cruz County Local Agency Formation Com.* (2011) 200 Cal.App.4th 1317, 1321 (*Community Water*).)

In 2006 the boundaries of the City's water service area were adjusted to include areas outside the City limits that were receiving water service at that time. The Santa Cruz Local Agency Formation Commission (LAFCO) approved the boundary line adjustment, but excluded the North Campus from the City's water service area.[6]

---

[4] The record is unclear as to whether there are five or nine service connections in the City infrastructure delivering water to the UC Santa Cruz campus boundaries.

[5] "The University of California is required periodically to develop a comprehensive, long-range development plan . . . to guide development for each campus, based on the academic goals and projected enrollment for that campus. (Ed. Code, § 67504, subd. (a)(1).)" (*Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226, 231.)

[6] "The Cortese-Knox-Hertzberg Local Government Reorganization Act of 2000 . . . (§ 56000 et seq.) was enacted 'to encourage "planned, well-ordered, efficient urban development patterns with appropriate consideration of preserving open-space [and agricultural] lands within those patterns" [citation], and to discourage urban sprawl and encourage "the orderly formation and development of local agencies based upon local conditions and circumstances." ' [Citation.] A LAFCO is the administrative body within each county that oversees urban development." (*Community Water*, *supra*, 200 Cal.App.4th at pp. 1323–1324.)

However, according to the campus water service manager, the location of the City's water service connection and the infrastructure for carrying water to the existing development in the North Campus are located, at least in part, outside of the City's water service boundary. The record also reflects that the City has continued to provide water that serves the existing development in the North Campus.

### C. *Controversy Arises Regarding Water Service to UC Santa Cruz*

In 2008 the City adopted an ordinance that stated: "It shall be the policy of the City not to extend City water and sewer services to the [UC Santa Cruz] beyond the existing City limits without the prior approval of the Local Agency Formation Commission (LAFCO), which is required by State law for all amendments and extensions of service outside a jurisdiction's boundaries." The ordinance also stated that its purpose was to "to minimize the problems caused by previous [UC Santa Cruz] growth."

Meanwhile, after the Regents had approved the 2005 LRDP for UC Santa Cruz, a number of lawsuits challenging the plan were filed and subsequently resolved in a 2008 comprehensive settlement agreement. The terms of the 2008 comprehensive settlement agreement addressed water service, including the following statement: "The City currently provides water service to [UC Santa Cruz] through five (5) connections, the most northern of which is north of the City's limits and was installed by the City in 1973. The City will continue to provide water service to the Campus through the five existing connections, and [UC Santa Cruz] may use the water to support development implementing the 2005 LRDP, including the development of housing in the North Campus, consistent with the other provisions of this Agreement."

Additionally, "[a]s part of [the 2008 comprehensive settlement] agreement, [UC Santa Cruz] agreed to apply to LAFCO for an extension of City water and sewer services to the north campus area where a portion of the new construction would be located. City agreed to obtain LAFCO's approval to amend its sphere of influence to

7

encompass the north campus area. Thereafter, [UC Santa Cruz] submitted application No. 929 for extension of the water and sewer services and City applied to amend its sphere of influence."[7] (*Community Water*, *supra*, 200 Cal.App.4th at p. 1321.)[8] However, the Regents note that "Santa Cruz County LAFCO did not act on the applications and terminated consideration of both the City's and [UC Santa Cruz]'s applications in September 2020." The 2008 comprehensive settlement agreement also provided that it would be in effect "[f]or as long as the 2005 LRDP is in effect."

The Regents have continued to pay for the water delivered to the UC Santa Cruz campus under the terms of the 1962 Agreement and the 1965 Agreement, and have not complained that the water supplied by the City is insufficient. In 2017, 2019, and 2020, the Regents sent letters to the City "asserting The Regents' rights under the 1962 and 1965 Agreements and asking the City to respond confirming the City's commitments under those agreements." The City did not respond to any of these letters.

On October 16, 2020, the City's mayor, Justin Cummings, issued a "public letter" not on City letterhead addressing the City's obligations under the 1962 and 1965 Agreements. The letter states in part: "The University has initiated a lawsuit against the city to require the city to extend water services beyond the city limits into upper campus, which the city believes it is not obligated to do. Based on state law, the [2008] Comprehensive Settlement Agreement, and the Municipal Code, the city council is unable to provide water and service to the north campus at this time despite the language in the contracts signed in the early 1960s." However, the record reflects that City has not limited its water service to the UC Santa Cruz campus in any respect.

---

[7] A challenge to the adequacy of the City's analysis of water supply impacts of the North Campus development proposed in the 2005 LRDP was addressed in *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1289.)

[8] " 'Sphere of influence' means a plan for the probable physical boundaries and service area of a local agency, as determined by [LAFCO]." (Gov. Code, § 56076.)

In September 2021 UC Santa Cruz issued a new LRDP (2021 LRDP), which the parties agree caused the 2008 comprehensive settlement agreement by its terms to no longer be in effect. Sarah Latham, the Vice Chancellor of Business and Administrative Services for UC Santa Cruz, stated in her December 2021 declaration that "[a]s a component of the 2021 LRDP, new development is proposed in, among other areas, the North Campus area of the [UC Santa Cruz]. [¶] Development of the North Campus under the 2021 LRDP requires the provision of water service from the City. [UC Santa Cruz] cannot construct or use the planned development in the North Campus without a supply of potable water."

## III. PROCEDURAL BACKGROUND

### A. *The Complaint*

The currently operative pleading is the Regents' second amended complaint (complaint) naming the City as the defendant. The Regents allege that the 1962 Agreement and the 1965 Agreement together require the City to provide the entire UC Santa Cruz campus with water. According to the Regents, the parties complied with the terms of these agreements for 40 years, until the Regents began consideration of the 2005 LRDP for UC Santa Cruz.

The Regents further allege that in 2005 and 2006 the City took steps to limit the ability of UC Santa Cruz to obtain water for those parts of the campus outside City limits. These steps included placing two ordinances on the ballot that would prohibit the City from providing water and sewer service to any part of the UC Santa Cruz campus outside City limits without the approval of LAFCO. The City also applied to LAFCO for a water service area boundary map that excluded the North Campus from the City's water service area, which LAFCO approved.

The Regents responded by filing legal challenges to the proposed ordinances and LAFCO's approval of the City's water service area boundary map. The City and others filed legal challenges to the 2005 LRDP. All legal challenges were resolved in the

9

2008 comprehensive settlement agreement. As part of the settlement, the Regents agreed to apply to LAFCO for water service to the North Campus and the City agreed to apply to LAFCO to deliver extraterritorial water service to the North Campus. However, according to the Regents, LAFCO did not act on the applications and in 2020 LAFCO terminated its consideration of the applications. The Regents stated that the 2008 comprehensive settlement agreement will expire under its terms when the 2021 LRDP for the UC Santa Cruz campus is adopted.

Thereafter, in 2017 the Regents sent a letter to the City "asserting the Regents' rights under the 1962 and 1965 Agreements and asking the City to respond confirming the City's commitments under those agreements." The City did not respond to the 2017 letter. In 2019 the Regents sent a second letter to the City again "asserting the Regents' rights under the 1962 and 1965 Agreements and asking the City to respond confirming the City's commitments under those agreements." The City did not respond to the 2019 letter.

In February 2020 the Regents issued a notice of preparation of an environmental impact report for the next LRDP. In March 2020 "the Regents sent a letter to the City again asserting the Regents' rights under the 1962 and 1965 Agreements and again asking the City to respond confirming the City's commitments under those agreements." The Regents allege that City responded indirectly to the March 2020 letter by way of a City planner's comment letter on the notice of preparation for the next LRDP that indicated the City had approval authority over the provision of water to the campus development planned in the next LRDP. Further, the mayor of Santa Cruz issued a public letter on October 16, 2020, that stated: "The University has initiated a lawsuit against the city to require the city to extend water services beyond the city limits into upper campus, which the city believes it is not obligated to do. Based on state law, the Comprehensive Settlement Agreement, and the Municipal Code, the city council is

10

unable to provide water and service to the north campus at this time despite the language in the contracts signed in the early 1960s."

Based on these and other allegations, the Regents assert causes of action for declaratory relief, breach of contract—specific performance, and breach of contract—damages. In the first cause of action for declaratory relief, the Regents asserted that a present controversy exists regarding (1) the City's obligation to provide water service throughout the UC Santa Cruz campus as necessary for development pursuant to the 1962 and 1965 Agreements; and (2) whether the City is excused from providing water service to the North Campus unless the City obtains LAFCO approval pursuant to section 56133, subdivision (a) for service outside its jurisdictional boundary.

The Regents seek a declaration that (1) "under the 1962 and 1965 Agreements, the City is obligated to provide water service throughout the [UC Santa Cruz] Campus '[a]s may be necessary to provide for campus development' " and (2) "that the City's performance of its obligations under the 1962 and 1965 Agreements is not excused by any local or state law, including that Government Code section 56133 does not require the City to obtain LAFCO approval before the City complies with the terms of the Agreements or otherwise excuses the City's performance under the Agreements."

In the second cause of action for breach of contract, the Regents seek specific performance of the 1962 and 1965 Agreements, under which the "City is obligated to provide water throughout the Campus '[a]s may be necessary to provide for campus development.' " In the third cause of action for breach of contract, which, as noted, the parties agreed to bifurcate, the Regents seek, in the absence of specific performance, damages "from the City to compensate the Regents and [UC Santa Cruz] for the costs of obtaining sufficient water and sewer service to support campus development from another source."

11

**B.** *The Regents' Motion for Summary Adjudication*

The Regents moved for summary adjudication of the first cause of action for declaratory relief and the second cause of action for breach of contract—specific performance, asserting that the relevant facts are undisputed.

Regarding the cause of action for declaratory relief, the Regents asserted that a present controversy exists regarding whether the City is obligated to supply water to the entire UC Santa Cruz campus, including the North Campus, under the terms of the 1962 and 1965 Agreements. The Regents contended that the controversy must be resolved in their favor because the 1962 and 1965 Agreements are properly interpreted in combination to provide that: "(1) the City is required to supply water to the entire UC [Santa Cruz] Campus, including the North Campus; (2) the City is required to supply up to 2,000,000 gallons per day to service water needs on the entire Campus; and (3) the City is required to bill The Regents for the entire Campus as one user, to be billed at rates equivalent to those charged to large scale industrial users."

Additionally, the Regents argued that LAFCO approval is not required before City can provide water service to the North Campus. They point out that section 56133, the statute that governs LAFCO's authority to approve a city's provision of extended services outside its jurisdictional boundaries, expressly provides that " '[t]his section does not apply to an extended service that a city or district was providing on or before January 1, 2001.' (. . . § 56133, subd. (e). . . .)" Since the City was providing water service to the UC Santa Cruz campus prior to 2001, including the North Campus, the Regents argue that section 56133, subdivision (e) exempts the 1962 and 1965 Agreements from LAFCO jurisdiction.

The Regents therefore sought a declaration that "the City is compelled to supply the North Campus with water." The Regents also sought specific performance, including an order requiring the "City to specifically perform its duties under the 1962 and 1965 Agreements." The Regents argued that the undisputed facts show that they are entitled to

12

specific performance because it is undisputed that the agreements exist, the Regents have performed under the agreements, the City has breached these agreements by failing to provide water for the development of the North Campus, and damages are an inadequate remedy.

### C. *The City's Opposition to the Regents' Motion for Summary Adjudication*

Although the City argued in its memorandum of points and authorities that the Regents' motion for summary adjudication of the causes of action for declaratory relief and breach of contract—specific performance should be denied, the City acknowledged at the outset that the "City does not dispute, and has never disputed, that the University in the 1962 and 1965 Agreements bargained for a contract that would assure its ability to water its entire campus during its future development. To this end, the University negotiated for infrastructure with the capacity to do so."

However, the City argued that the 1962 and 1965 Agreements must be interpreted to require the City to meet only three obligations: "(1) the construction of water lines to the campus boundary; (2) making water services available at 'rates no less favorable than those prevailing to large-scale industrial users'; and (3) treat the campus's three legal parcels as a 'single premise for billing purposes.' "

Based on this interpretation, the City contended that the 1962 and 1965 Agreements do not require the City to deliver a "minimum specified volume of water" through its infrastructure. Additionally, the City contended that there was no language in the 1962 and 1965 Agreements that would impose a continuing obligation on the City to provide water lines for campus development beyond the initial development of the campus. The City also construes the annexation clause in the 1965 Agreement to mean that the parties intended that the City was not obligated to provide water to campus property outside the City's water service area unless the Regents exercised the annexation clause.

13

Further, the City argued that extrinsic evidence is admissible to show that the Regents' interpretation of the 1962 and 1965 Agreements is erroneous. According to the City, if the Regents intended to bargain for a specific water volume for the UC Santa Cruz campus, they could have done so, as shown by the terms in the Regents' 1964 agreement with the Irvine Ranch Water District contracting for a specific volume of water. Additionally, the City asserted that the Regents admitted in the 2005 LRDP that the City's water service infrastructure can deliver sufficient water for the entire UC Santa Cruz campus through the campus infrastructure.

Alternatively, the City argued that the 1962 and 1965 Agreements currently have no force and effect. The City explained that the language of the 1962 and 1965 Agreements shows that the parties did not intend the agreements to remain in effect after the City had performed its obligations to provide water infrastructure for the initial development of UC Santa Cruz under the "University Development Plan" referenced in the 1962 Agreement and adopted in 1963, and did not intend the City to provide additional water infrastructure.

The City further contended that summary adjudication of the declaratory relief cause of action must be denied because the City cannot expand water service beyond its jurisdictional boundary to the North Campus without approval of the extension of extraterritorial water service from LAFCO.[9] The City also argued that only LAFCO can decide whether the Regents are exempt from applying to LAFCO for water service to the North Campus under section 56133, subdivision (e)(4), which provides that LAFCO approval is not required for "[a]n extended service that a city or district was providing on or before January 1, 2001." According to the City, the 1962 and 1965 Agreements only

_____

[9] Section 56133, subdivision (a) provides: "A city or district may provide new or extended services by contract or agreement outside its jurisdictional boundary only if it first requests and receives written approval from the commission of the county in which the affected territory is located."

14

provided for water infrastructure, not water service, to the campus boundary, and therefore the section 56133, subdivision (e) exemption does not apply. Since the Regents have not applied to LAFCO for approval of the City providing extraterritorial water service to the North Campus, the City maintained that the Regents have failed to exhaust administrative remedies.

The City also argued that because only LAFCO can decide if the section 56133, subdivision (e) exemption applies, LAFCO is an indispensable party whose joinder is required under Code of Civil Procedure section 389, subdivision (a).

Regarding the cause of action for breach of contract--specific performance, the City contended that summary adjudication must be denied because the City has not breached the 1962 and 1965 Agreements. First, the City asserted that the Regents have admitted that the City has provided water service to the UC Santa Cruz campus since the execution of the 1965 Agreement. Second, the City argued that an anticipatory breach has not occurred because the City's ordinances do not preclude the Regents from applying for LAFCO approval for extraterritorial water service to the North Campus or obtaining City annexation, and the mayor's public letter and the City planner's comment letter on the 2005 LRDP do not constitute an express repudiation of the 1962 and 1965 Agreements.

Finally, the City argued that the Regents' causes of action for breach of contract based on City's 2008 ordinances and 2006 water service area boundary adjustment are time-barred under the four-year limitations period for breach of contract claims (Civ. Code, § 337) because the Regents' complaint was filed in 2020.

D. *The City's Motion for Summary Judgment*

In addition to opposing the Regents' motion for summary adjudication, the City filed a motion for summary judgment, or, in the alternative, summary adjudication of the first cause of action for declaratory relief and the second cause of action for breach of contract—specific performance, that reiterated the City's arguments.

As to the first cause of action for declaratory relief, the City argued that the 1962 and 1965 Agreements must be interpreted to provide that the City only has these three obligations: "(1) the construction of water lines to the campus boundary; (2) making water services available at 'rates no less favorable than those prevailing to large-scale industrial users'; and (3) treat the campus's three legal parcels as a 'single premise for billing purposes.' " The City asserted that it has complied with these obligations, which supports its interpretation.

The City also argued that the 1962 and 1965 Agreements cannot be interpreted to provide that City has an obligation to provide a specific volume or water, or to provide water lines for campus development other than the initial development of the UC Santa Cruz campus. Further, the City argued that the annexation clause in the 1965 Agreement shows that the parties contemplated that the Regents would guarantee City water service to the entire campus by annexation of those portions of the campus outside the City's service area.

The City additionally argued that assuming the 1962 and 1965 Agreements are reasonably susceptible of the Regents' interpretation, extrinsic evidence is admissible and supports City's contrary interpretation. The City again argued that the Regents' 1964 agreement with the Irvine Ranch Water District shows that when the Regents intended to bargain for a specific water volume, that term was included in the agreement. The City asserted that the Regents admitted in the 2005 LRDP that the existing City water infrastructure can deliver sufficient water for the entire UC Santa Cruz campus.

Further, the City urged that the 1962 and 1965 Agreements must be interpreted to have a definite duration, such that City's full performance of its obligations under the agreements has rendered the agreements no longer in effect. Alternatively, the City argued that the parties' continuing performance under the agreements means only that the City agreed to provide water service at the specified billing rate, and not an ongoing

16

obligation to provide new water infrastructure or water service beyond the campus boundary.

The City reiterated its arguments that the cause of action for declaratory relief also fails because the Regents are required to apply to LAFCO for approval of the City's expansion of extraterritorial water service to the North Campus; LAFCO must determine whether the section 56133, subdivision (e) exemption for extraterritorial water service provided before 2001 applies; and the Regents failed to exhaust administrative remedies because they have not applied to LAFCO for the section 56133, subdivision (e) exemption.

Regarding the second cause of action for breach of contract—specific performance, the City argued that this cause of action fails because neither the City ordinances and other communications indicating that City would not provide water service outside its water service area, nor the City's lack of response to the Regents' 2017, 2019, and 2020 letters asserting rights under the 1962 and 1965 Agreements, constitute breaches of the agreements. The City argued it cannot extend water service outside City limits absent LAFCO approval, and the City's silence in response to the Regents' letters does not constitute an anticipatory repudiation of the 1962 and 1965 Agreements. The City also argued that the breach of contract claim is untimely under Code of Civil Procedure section 337 as to the alleged breaches other than the City's lack of response to the 2017, 2019, 2020 letters and the former mayor's 2020 public letter.

**E. *The Regents' Opposition to City's Motion for Summary Judgment***

The Regents began their opposition to the City's motion for summary judgment or, in the alternative, summary adjudication, by clarifying their claim against the City, as follows: "The Regents' only claim is that the Agreements require the City to provide water *service* to all parts of the Campus, including the North Campus, and that the City is in breach of the Agreements by failing and refusing to provide such service. The Regents do not allege, as the City argues, that the City is required to build additional

17

infrastructure, that the City is required to provide a certain quantity of water, or that the City has breached the Agreements by enacting legislation or seeking approvals from [LAFCO]."

Regarding the first cause of action for declaratory relief, the Regents argued that the plain language of the 1962 and 1965 Agreements show that the City is obligated to supply water to the entire campus. The Regents pointed to language in the 1962 Agreement requiring the City to make water services available to the University, asserting that a commonsense interpretation is that City is required to make water service available for use on the entire UC Santa Cruz campus. The Regents also argued that the 1965 Agreement did not alter the City's responsibility to provide water service, since the 1965 Agreement described the specifications for the water service infrastructure without limiting the City's water supply commitment. Further, the Regents contended that their interpretation is supported by the parties' subsequent conduct, where the City has supplied water service to the campus and the Regents have paid for that service under the terms of the 1962 and 1965 Agreements.

The annexation clauses in the agreements do not support the City's interpretation of the agreements, the Regents also argued, noting that the 1962 Agreement provides that municipal police and fire services were expressly limited to the portions of the campus within City limits, with no such limitation for water services. The Regents also argued that purpose of the annexation clause was to allow the Regents to obtain City police and fire services for the entire campus by annexation.

Regarding oversight by LAFCO, the Regents rejected the City's argument that the City cannot provide extraterritorial water service to the North Campus without LAFCO approval, again asserting that section 56133, subdivision (e) provides that the City's water service to the North Campus is exempt from LAFCO's jurisdiction because the City was providing water service to the campus under the 1962 and 1965 Agreements prior to 2001.

18

The Regents also rejected the City's arguments that the breach of contract—specific performance cause of action must fail. Their claim for breach of contract, the Regent maintained, is based upon City's failure to respond to the Regents' letters demanding performance under the 1962 and 1965 Agreements and public statements that the City would not perform its obligations. Also, since the Regents are alleging a continuing breach of contract, the Regents argued that the statute of limitations has not expired.

## F.  *Trial Court Order and Judgment*

In the September 30, 2022 order the trial court denied the Regents' motion for summary adjudication and granted City's motion for summary adjudication.

Regarding the Regents' motion for summary adjudication of the cause of action for declaratory relief, the trial court ruled that "the 1962 Agreement did not commit the City to providing any specific amount of water, to deliver water beyond the Campus boundary, or to provide unlimited water for any and all future development. Instead, the Agreement reflects the commitments made by the City by requiring the City to only provide a water delivery system up to the campus boundary capable of supplying up to 2,000,000 gallons of water in twenty-four hours."

The trial court further found that, although it was undisputed that City delivers water to the campus boundary which is then distributed to the campus, including the North Campus, through the university's own infrastructure, it cannot be inferred that City agreed to supply the entire North Campus. Additionally, the trial court found that the annexation clauses in the 1962 and 1965 Agreements indicated the parties' mutual intent that annexation was a prerequisite to City providing water service to new campus development outside City's jurisdiction.

Based on this analysis, the trial court concluded that "the Agreements cannot reasonably be interpreted as contractually obligating the City to provide water for all future development within the Campus boundary, including the new development

19

planned in the North Campus. However, this analysis and finding is not to be interpreted as limiting the City's obligation to provide sufficient water to supply the currently existing campus operations, including those portions of the North campus that were developed in 1998 [*sic*] and 2002."

As to LAFCO, the trial court agreed with the City that it could not extend water service to the North Campus absent annexation or approval of the extension of extraterritorial services by LAFCO, and LAFCO was the arbiter of whether the section 56133, subdivision (e)(4) exemption for extended services provided before 2001 applied. The trial court therefore determined that LAFCO was an indispensable party and the Regents' failure to join LAFCO as a party was fatal to the cause of action for declaratory relief. However, the trial court rejected the City's argument that the Regents had failed to exhaust administrative remedies.

The trial court therefore denied the Regents' motion for summary adjudication of the cause of action for declaratory relief and granted the City's motion, concluding that the Regents had "failed to meet [their] burden on [their] motion for summary adjudication of the cause of action for declaratory relief, as it has failed to demonstrate (1) that the Agreements include either express or implied terms obligating the City to provide water for the North Campus; and/or (2) that Government Code section 56133 does not require the City to obtain LAFCO approval prior to the City providing water to the North campus."

The trial court also denied the Regents' motion for summary adjudication of the cause of action for breach of contract—specific performance and granted the City's motion, ruling that "[i]n light of this Court's interpretation of these Agreements, the City has no contractual obligation to provide water to North Campus. Regardless, a failure to respond to the University's request for confirmation of such an obligation under the Agreements does not constitute a refusal to perform."

20

The judgment entered on September 30, 2022, dismissed the Regents' complaint with prejudice and entered judgment for the City.

## IV.  DISCUSSION

On appeal, the Regents contend that the trial court erred in denying their motion for summary adjudication of the causes of action for declaratory relief and breach of contract—specific performance, granting the City's motion for summary adjudication, dismissing the Regents' complaint, and entering judgment in the City's favor.  We will first address the applicable the standard of review.

### A. *Standard of Review*

A party may move for summary judgment of an entire action or, in the alternative, summary adjudication of a cause of action.  (Code Civ. Proc., § 437c, subds. (a)(1) & (f)(1), (2).)  Both motions are "subject to the same rules and procedures."  (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 ; see Code Civ. Proc., § 437c, subd. (f)(2).)

A plaintiff moving for summary judgment "bears the burden of persuasion that 'each element of' the 'cause of action' in question has been 'proved,' and hence that 'there is no defense' thereto.  [Citation.]"  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*); Code Civ. Proc. § 437c, subd. (p)(1).)  "Once the plaintiff . . . has met that burden, the burden shifts to the defendant . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto.  The defendant . . . shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto."  (Code Civ. Proc. § 437c, subd. (p)(1).)

A defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action.  (Code Civ. Proc.,

21

§ 437c, subd. (o); *Aguilar*, *supra*, 25 Cal.4th at p. 850.)  If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied.  However, if the moving papers make a prima facie showing that justifies a judgment in the defendant's favor, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 849.)

In determining whether the parties have met their respective burdens, "the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar*, *supra*, 25 Cal.4th at p. 843, fn. omitted.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id*. at p. 850, fn. omitted.)

"In reviewing a trial court's grant of summary judgment, . . . ' "[w]e take the facts from the record that was before the trial court when it ruled on that motion" ' and ' " ' "review the trial court's decision de novo . . . " ' " ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039.)  The trial court's stated reasons are not binding on the reviewing court, "which reviews the trial court's ruling, not its rationale.  [Citation.]" (*Ramalingam v. Thompson* (2007) 151 Cal.App.4th 491, 498.)[10]

---

[10] Since we will review the trial court's summary adjudication order under the independent standard of review, we need not address the Regents' argument on appeal that the judgment must be vacated because the trial court's order was based on a void order by a disqualified judge.

### B. *Cause of Action for Declaratory Relief*

#### 1. The Parties' Contentions

On appeal, the Regents argue that the trial court erred in granting the City's motion for summary adjudication of the cause of action for declaratory relief and denying their motion for summary adjudication. The Regents contend that as a matter of law they are entitled to a declaration that " 'that the 1962 and 1965 Agreements require the City to provide water service throughout the campus "[a]s may be necessary to provide for campus development" via a system that is "at all times be capable of supplying to the University water up to 2,000,000 gallons in twenty-four hours for fire flow and ordinary use." ' " The Regents further argue that LAFCO approval is not required before the City can supply water to the entire UC Santa Cruz campus, and LAFCO is therefore not an indispensable party.

The City argues to the contrary that the trial court correctly interpreted the terms of the 1962 and 1965 Agreements to not obligate the City to provide water service for future development. The City further argues that the trial court correctly ruled that either LAFCO approval for water service beyond the City's jurisdiction or annexation is required before the City can expand water service to the North Campus, which is outside the City's jurisdictional boundary.

We will begin our review of the parties' contentions with the rules governing summary adjudication of a cause of action for declaratory relief.

#### 2. Summary Adjudication of a Declaratory Relief Cause of Action

"Code of Civil Procedure section 1060[11] does not require a breach of contract in order to obtain declaratory relief, only an 'actual controversy.' Declaratory relief

---

[11] Code of Civil Procedure section 1060 provides: "Any person interested under . . . a contract . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the premises, including a (continued)

pursuant to this section has frequently been used as a means of settling controversies between parties to a contract regarding the nature of their contractual rights and obligations. [Citations.]" (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647-648 (*Meyer*).)

"Summary judgment is appropriate in a declaratory relief action when only legal issues are presented for the court's determination. [Citation.] The defendant's burden in a declaratory relief action 'is to establish the plaintiff is not entitled to a declaration in its favor. It may do this by establishing (1) the sought-after declaration is legally incorrect; (2) undisputed facts do not support the premise for the sought-after declaration; or (3) the issue is otherwise not one that is appropriate for declaratory relief.' [Citation.]" (*California Public Records Research, Inc. v. County of Yolo* (2016) 4 Cal.App.5th 150, 185.) Thus, "[t]he court may properly grant summary adjudication of a claim for declaratory relief. [Citation.]" (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1156.)

Where, as here, the plaintiff has moved for summary judgment or summary adjudication in a declaratory relief action, we determine that the converse is required. The plaintiff may show it is entitled to a declaration in its favor by establishing (1) the sought-after declaration is legally correct; (2) the undisputed facts support the premise of the sought-after declaration; and (3) the issue is appropriate for declaratory relief.

In the present case, we determine that the undisputed facts show that the crux of the parties' controversy is the issue of whether the City is obligated to supply water for the further development of that portion of the UC Santa Cruz campus known as the North

---

determination of any question of construction or validity arising under the instrument or contract. He or she may ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time. The declaration may be either affirmative or negative in form and effect, and the declaration shall have the force of a final judgment. The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought."

Campus, which is outside City's jurisdictional boundaries, under the terms of the 1962 and 1965 Agreements. We also determine that the issue is appropriate for declaratory relief.

Although the Regents also seek a declaration that the City's water service must include " 'a system that is "at all times be capable of supplying to the University water up to 2,000,000 gallons in twenty-four hours for fire flow and ordinary use," ' " the parties have not shown that actual controversy exists regarding the specifications of City's water infrastructure that provides water service to the UC Santa Cruz campus under the terms of the parties' agreements. In the absence of an actual controversy, declaratory relief regarding those contractual provisions is not appropriate. (See *Meyer*, *supra*, 45 Cal.4th at p. 647.)

Next, we consider whether the declaration sought by the Regents is legally correct and supported by the undisputed facts, beginning with the interpretation of the 1962 and 1965 Agreements.

### 3. Contract Interpretation

The Regents contend that the plain language of the 1962 and 1965 Agreements " 'require the City to provide water service throughout the campus "[a]s may be necessary to provide for campus development" via a system that is "at all times be capable of supplying to the University water up to 2,000,000 gallons in twenty-four hours for fire flow and ordinary use." ' "

In other words, the Regents explain, "the language of the Agreements requires the City to provide water service to the campus boundary and that, after delivery, the University can use that water to support its campus development anywhere on the University's property. [Citation.] Once the City delivers water service to the campus boundary, there is no difference if that water is used on the North Campus or any other part of its campus. [Citation.]" The Regents also argue that the trial court erred in considering extrinsic evidence that the court determined showed that the parties had

25

agreed that annexation was a prerequisite for the City to provide water service for new campus development outside the City's jurisdiction.

The City responds that the trial court correctly determined that there is no language in the 1962 and 1965 Agreements that would obligate the City to provide water for all future development of the campus, including new development in the North Campus. The City further argues that the Regents negotiated the annexation clause in the 1965 Agreement to guarantee that water service to the entire campus could be obtained by exercising their right to annexation.

To evaluate the parties' contentions regarding the interpretation of the 1962 and 1965 Agreements we turn to the well-established rules of contract interpretation. " 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. " ' "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]" ' [Citation.]" *(Ameron Internat. Corp. v. Insurance Co. of State of Pennsylvania* (2010) 50 Cal.4th 1370, 1378.)

We therefore first examine the pertinent language of the 1962 and 1965 Agreements. The 1962 Agreement states: "As may be necessary to provide for campus development, City shall provide, at no expense to University, any and all water lines and sanitary sewer lines up to the boundaries of said Campus Area as good engineering practice and the reasonable needs of the University and of the City may require." The 1962 Agreement also states: "City shall make water and sewer services available to the University at rates no less favorable than those prevailing to large-scale industrial users."

26

The 1965 Agreement states: "[T]he [water] system described shall at all times be capable of delivering to the University system in Pressure Zone 4, water at the rate of 3,000 gallons per minute for fire protection . . . ; and the system shall be at all times be capable of supplying to the University water up to 2,000,000 gallons in twenty-four hours for fire flow and ordinary use." Additionally, the 1965 Agreement states: "University's Parcels A, B, and C, as described in [the 1962 Agreement], and University-owned and operated areas contiguous thereto shall constitute a single premise for billing purposes."

Our review shows that the plain language of the 1962 and 1965 Agreements required the City to construct water lines with certain specifications to the Campus Area boundaries as necessary for campus development. The parties do not dispute that the City has constructed water lines as required by the 1962 and 1965 Agreements, as well as service connections. The plain language of the 1962 Agreement also requires the City to make water service "available" to the Regents, meaning that water service would be ready for immediate use by UC Santa Cruz at the agreed-upon rates. We rely upon the dictionary definition of "available," since "[w]hen attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word. [Citations.]" (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121–1122.) "Available" is defined as "present or ready for immediate use." (Merriam-Webster Unabridged Dict. Online (2024) <http://merriam-webster.com/dictionary/available> [as of Nov. 21, 2024], archived at: <https://perma.cc/SV8Z-SS2L>; see also *McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 115 [same].)

Significantly, the 1962 and 1965 Agreements do not place any restrictions on the Regents' use of the water that the City was obligated to make available through the City-installed water lines, other than to require the Regents to pay for the water at the agreed-upon rates. There is no language in the 1962 and 1965 Agreements stating that City's water service would be limited to providing water only for use by those portions of the

27

UC Santa Cruz campus within City limits or only for use during the initial development of the campus. To the contrary, the 1965 Agreement provided that the Regents would be billed for water service as one billing unit for the entire campus, including water supplied to Parcels A, B, and C outside the City limits, with no distinction between the developed and undeveloped parts of the campus.

Accordingly, we determine that the plain language of the 1962 and 1965 Agreements is properly interpreted to require the City to provide water service through the City-installed water lines to the UC Santa Cruz campus boundaries for immediate use within any part of the campus through UC Santa Cruz's own water infrastructure, as was mutually intended by the parties. Further, we find no merit in the City's contention that it cannot provide water service to the North Campus absent annexation of that part of the campus by the City, since the plain language of the 1962 Agreement expressly states that municipal police and fire services are limited to the portions of the campus within City limits, with no limitation for water services.

However, a contract is ambiguous if it is "reasonably susceptible to more than one interpretation. [Citation.]" (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 389.) Extrinsic evidence is permitted to interpret a contract when its language is ambiguous. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) "The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the [ ] court unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.' " (*Ibid*.) The threshold determination of whether the contract is ambiguous is one of law, and is thus subject to independent review. (*Ibid*.)

Here, we determine that the evidence presented in support of the parties' motions for summary adjudication of the cause of action for declaratory relief shows that the 1962 Agreement is arguably ambiguous as to whether the City had agreed to provide water service only for the initial development of the UC Santa Cruz campus, or for all

28

future campus development. The evidence shows that the context of the 1962 Agreement was the culmination of the City's efforts to induce the Regents to locate a new University of California campus in the Santa Cruz area, including the City's promise to construct water lines to the boundaries of the new UC Santa Cruz campus at no cost to the Regents and thereafter to make the City water service available to the campus.

The evidence also shows that the context of the 1962 Agreement included the initial development of the UC Santa Cruz campus. We note that the 1962 Agreement stated that the City would construct water lines to the campus boundaries as "necessary to provide for campus development," and the evidence shows that the water lines were constructed as agreed between 1965 and 1974.

However, "[i]t is well-settled law that, although an agreement may be indefinite or uncertain in its inception, subsequent performance by the parties under the agreement will cure this defect and render it enforceable. When one party performs under the contract and the other party accepts his performance without objection it is assumed that this was the performance contemplated by the agreement. [Citations.] [¶] This rule is in accord with the cardinal rule of construction that when a contract is ambiguous or uncertain the practical construction placed upon it by the parties before any controversy arises as to its meaning affords one of the most reliable means of determining the intent of the parties. [Citation.]" (*Bohman v. Berg* (1960) 54 Cal.2d 787, 794-795 (*Bohman*); *Sterling v. Taylor* (2007) 40 Cal.4th 757, 772-773 [same].)

The evidence submitted by the parties in their competing motions for summary adjudication shows that it is undisputed that the parties performed under the 1962 and 1965 Agreements for approximately 40 years before any controversy arose regarding the City's water service. The City provided water service to the UC Santa Cruz campus from 1965 to approximately 2006 (when LAFCO excluded the North Campus from the City's water service boundary), without any controversy as to whether the City's obligation to

29

provide water service included service to new campus development, such as the development of the North Campus.

Moreover, the evidence shows that it is undisputed that the North Campus, which is outside City's jurisdiction and is partially developed with student apartments built in 1968 and portions of Colleges 9 and 10 built in 2002, receives water that is supplied by City's water service. It was also undisputed that the Regents have continued to pay the City for water service that is then distributed throughout the UC Santa Cruz campus through campus water infrastructure.

We therefore determine that the undisputed extrinsic evidence shows that "the practical construction" placed upon the water service provisions of the 1962 and 1965 Agreements by the parties before any controversy arose shows that the parties intended that the City would provide water service through the City's water lines to the campus boundaries, which could then be used for distribution to any part of the UC Santa Cruz campus through the campus water infrastructure, without any distinction as to whether the water service supplied new campus development or parts of the campus outside City jurisdiction. (See *Bohman*, *supra*, 54 Cal.2d at p. 795.)

### 4. LAFCO Exemption

We next address the Regents' contention that the trial court erred in ruling that LAFCO approval is required before the City can supply water to the entire UC Santa Cruz campus, and therefore LAFCO is an indispensable party. According to the City, the trial court correctly ruled that the Regents are required to petition LAFCO to obtain water service beyond the City's jurisdictional limits, including the expansion of water service to the North Campus; LAFCO determines whether section 56133, subdivision (e)(4) exemption applies; and LAFCO is an indispensable party pursuant to Code of Civil Procedure, section 389, subdivision (a).[12]

---

[12] Code of Civil Procedure section 389, subdivision (a) provides: "A person who (continued)

30

For several reasons, we agree with the Regents that LAFCO approval is not required before the City can provide water service for the entire UC Santa Cruz campus, including the North Campus. To begin with, as this court has previously noted, "[a] LAFCO is the administrative body within each county that oversees urban development. A LAFCO 'has only those express (or necessarily implied) powers which are specifically granted to it by statute.' [Citation.] A LAFCO's powers are set forth in section 56375." (*Community Water*, *supra*, 200 Cal.App.4th at p. 1324.) "In short, LAFCO is a public entity created by legislative fiat, and like similarly constituted public entities is a body of special and limited jurisdiction. [Citation.]" (*City of Ceres v. City of Modesto* (1969) 274 Cal.App.2d 545, 550; see also *Tracy Rural County Fire Protection Dist. v. Local Agency Formation Com. of San Joaquin County* (2022) 84 Cal.App.5th 91, 107 (*Tracy Rural*) [same].)

Section 56133, subdivision (a) provides that "[a] city or district may provide new or extended services by contract or agreement outside its jurisdictional boundary only if it first requests and receives written approval from the commission of the county in which the affected territory is located." At issue in the present case is the section 56133, subdivision (e)(4) exemption, which states: "This section does not apply to any of the following: [¶] . . . [¶] An extended service that a city or district was providing on or before January 1, 2001."

is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party."

The Regents contend that section 56133, subdivision (e)(4) applies to exempt the City's water service to the UC Santa Cruz campus from the section 56133, subdivision (a) requirement of LAFCO approval for new or extended services outside a city's jurisdictional boundary. The Regents explain that "[t]here is no dispute that the City was providing water service to the campus boundary for the University's use prior to January 1, 2001, pursuant to the1962 and 1965 Agreements. [Citations.] Thus, there is no 'new or extended' services if the City was to continue to provide water up to that campus boundary for the University's use."

The City disagrees, contending that section 56133, subdivision (e)(4) does not exempt the Regents from requesting LAFCO approval for water service to the North Campus because the "City never directly provided water service to the North Campus pursuant to the Agreements. Any water service the North Campus received was incidental and provided via the University's own on-campus infrastructure. In other words, the City has never provided water service to the North Campus or any other part of the undeveloped, non-annexed campus outside City limits as part of a 'contract for service.' " The City emphasizes that the "City serviced only the annexed (and developed) portion of the campus prior to 2001, while the University used its own infrastructure to deliver insignificant amounts of water to its non-annexed North Campus."

We do not find the City's argument to be persuasive. It is undisputed that the City has been providing water service to the boundaries of UC Santa Cruz campus since 1965 through water lines that the City constructed, and the municipal water has then been distributed throughout the campus, including areas outside the City's jurisdictional boundary, such as the North Campus, by the university's own water infrastructure.

Additionally, according to the campus water service manager, the location of the City's water service connection and the infrastructure for carrying water to the existing development in the North Campus are located, at least in part, outside the City's water

32

service boundary. The evidence also shows that it is undisputed that the City did not distinguish the parts of the campus that the City believed were outside the City's jurisdictional boundaries for purposes of water service until sometime in 2006.

We therefore determine that it cannot be disputed that the City was providing water service to the UC Santa Cruz campus that extended to supplying water beyond the City's jurisdictional boundaries, including the North Campus, on or before January 1, 2001. Consequently, we determine that section 56133, subdivision (e)(4) applies to exempt the City's water service to the UC Santa Cruz campus from the section 56133, subdivision (a) requirement of LAFCO approval for new or extended service. The Regents are therefore not required under section 56133, subdivision (a) to request LAFCO approval before receiving City water service that supplies new development in the North Campus.

We are also not persuaded by the City's argument that LAFCO is the arbiter of its own jurisdiction, such that LAFCO must decide in the first instance whether a city is exempt from requesting LAFCO approval for new or extended service outside its jurisdictional boundaries pursuant to section 56133, subdivision (e)(4). Section 56375, which enumerates the powers and duties of a LAFCO, provides that a LAFCO has the power "[t]o authorize a city or district to provide new or extended services outside its jurisdictional boundaries pursuant to Section 56133." However, section 56375 does not provide that a LAFCO has the power or duty to determine whether section 56133, subdivision (e)(4) applies to exempt a city from the section 56133, subdivision (a) requirement of LAFCO approval for new or extended services outside the city's jurisdictional boundaries. It is " '[a] "familiar rule of construction is that where a statute enumerates things upon which it is to operate it is to be construed as excluding from its effect all those not expressly mentioned." [Citations.]' [Citation.]" (*Wright v. City of Santa Clara* (1989) 213 Cal.App.3d 1503, 1507.)

33

Even assuming, without deciding, that section 56133 is ambiguous as to whether a LAFCO has the power to determine whether a city is exempt from compliance with section 56133, subdivision (a) in the first instance, we find that the legislative history supports our analysis. " '[W]here "the statutory language is ambiguous on its face or is shown to have a latent ambiguity such that it does not provide a definitive answer, we may resort to extrinsic sources to determine legislative intent. [Citations.]" [Citation.] [Citation.]' " (*Tracy Rural*, *supra*, 84 Cal.App.5th at p. 108.) These extrinsic aids include legislative history. (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1184.)

Section 56133 was amended in 2002 to add the exemption (then § 56133, subd. (e)) at issue in this case. (Stats. 2002, ch. 548, § 6.) The Senate Bill analysis of the section 56133 amendments includes the following statement: "Existing law permits a city or district to provide extended services, as defined, outside its jurisdictional boundaries only if it first requests and receives written approval from the local agency formation commission in the affected county. Approval is not required for an extended service that a city or district was providing on January 1, 1994. [¶] This bill would extend that exemption from [LAFCO] approval to an extended service that a city or district was providing on or before January 1, 2001." (Sen. Rules Com. Analysis of Assem. Bill No. 2227 (2001-2002 Reg. Sess.) as amended June 25, 2002.)

Thus, the legislative history supports our analysis, since it shows that the Legislature did not intend a city to apply to LAFCO for a determination of whether the city is exempt. Both the statutory language and the legislative history state that a city is exempt from requesting LAFCO approval where the city was providing extended service on or before 2001; therefore, section 56133, subdivision (e)(4) cannot be construed to require a request for LAFCO approval of an exemption.

Accordingly, we determine that the section 56133, subdivision (e)(4) exemption from requesting LAFCO approval under section 56133, subdivision (a) applies because it

34

is undisputed that the City provided extended water service to the UC Santa Cruz campus before 2001. We therefore also determine that LAFCO is not an indispensable party whose joinder is required under Code of Civil Procedure, section 389, subdivision (a).

### C. *Cause of Action for Breach of Contract—Specific Performance*

In the second cause of action for breach of contract, the Regents seek specific performance of the 1962 and 1965 Agreements, under which the "City is obligated to provide water throughout the Campus '[a]s may be necessary to provide for campus development.' " On appeal, the Regents contend that the trial court erred in denying their motion for summary adjudication of the cause of action for breach of contract—specific performance, because they are entitled to specific performance of the City's obligation " 'to provide water service throughout the Campus "[a]s may be necessary to provide for campus development," via a system that "at all times be capable of supplying to the University water up to 2,000,000 gallons in twenty-four hours for fire flow and ordinary use." ' "

The Regents argue that they have established that the City breached its obligations under the 1962 and 1965 Agreements because the City has publicly refused to provide water pursuant to the Agreements, as shown by the mayor's public letter stating that the City would refuse to provide water service for new development in the North Campus despite the language of the Agreements. The Regents also argue that they have met the requirements for specific performance because the terms of the 1962 and 1965 Agreements are sufficiently definite; the consideration is adequate; there is substantial similarity of the requested performance--delivery of water to the campus--to the terms of the Agreements; there is mutuality of remedies since the Regents have counter-performed by locating the university near the City and paying water fees; and plaintiff's legal remedy is inadequate because damages are unlikely to compensate the Regents for the City's breach.

The City responds that the Regents have not shown that either an actual or anticipated breach of the 1962 and 1965 Agreements has occurred, and therefore specific performance cannot be granted. According to the City, it "has never clearly, positively, and unequivocally notified the University that it will refuse to comply with any alleged future contractual obligations. [Citation.]" In particular, the City asserts that neither its failure to respond to the Regents' letters requesting confirmation of water service to future development of the North Campus nor the mayor's personal opinions expressed in his 2020 letter constitute the City's express repudiation of the City's obligations under the 1962 and 1965 Agreements.

We determine that the Regents have not established as a matter of law that the City has breached the water service terms of the 1962 and 1965 Agreements, and therefore the Regents are not entitled to specific performance on this record. "[S]pecific performance is a *remedy* for breach of contract, a cause of action which requires proof the contract was breached. [Citation.]" (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 49.)

Here, we have previously determined that the terms of the 1962 and 1965 Agreements require the City to provide water service through the City's water lines, which may then be used for distribution to any part of the UC Santa Cruz campus through the campus water infrastructure, without any distinction as to whether the water service supplies new campus development or parts of the campus outside City jurisdiction. (See *Bohman*, *supra*, 54 Cal.2d at pp. 794-795 [doctrine of practical construction].) The Regents have provided no evidence to support their claim that the City has failed to perform these terms, since there is no evidence that the City has failed to supply water to the UC Santa Cruz campus.

However, "[t]he doctrine of breach of a contract by anticipatory repudiation is recognized in this state [Citation.] 'An anticipatory breach of contract occurs on the part of one of the parties to the instrument when he positively repudiates the contract by acts

36

or statements indicating that he will not or cannot substantially perform essential terms thereof. . . .' [Citation.] 'Anticipatory breach must appear only with the clearest terms of repudiation of the obligation of the contract.' [Citations.]" (*Guerrieri v. Severini* (1958) 51 Cal.2d 12, 18 (*Guerrieri*); see also *Johar v. California Unemployment Insurance Appeals Bd.* (2022) 83 Cal.App.5th 259, 281 [same].)

To show anticipatory repudiation of the 1962 and 1965 Agreements, the Regents rely upon the City's undisputed failure to respond to the Regents' 2017, 2019, and 2020 letters to the City "asserting The Regents' rights under the 1962 and 1965 Agreements and asking the City to respond confirming City's commitments under those agreements." The Regents also rely on the mayor's 2020 "public letter" not on City letterhead that states: "The University has initiated a lawsuit against the city to require the city to extend water services beyond the city limits into upper campus, which the city believes it is not obligated to do. Based on state law, the [2008] Comprehensive Settlement Agreement, and the Municipal Code, the city council is unable to provide water service to the north campus at this time despite the language in the contracts signed in the early 1960s."

This evidence is insufficient to show anticipatory repudiation as a matter of law, since the Regents have not shown that either City's failure to respond to the Regents' letters or the mayor's public letter constitute a repudiation of the 1962 and 1965 Agreements authorized by the City in the "clearest of terms." (See *Guerrieri*, *supra*, 51 Cal.2d at p. 18.)

Since the Regents have not established the threshold element of breach of contract, we therefore determine that summary adjudication of the cause of action for breach of contract—specific performance must be denied.

**D.** *Conclusion*

We conclude that the Regents' motion for summary adjudication of the first cause of action for declaratory relief should be granted for two reasons: (1) the undisputed extrinsic evidence shows that "the practical construction" placed upon the water service

37

provisions of the 1962 and 1965 Agreements by the parties before any controversy arose shows that the parties intended that the City would provide water service through the City's water lines, which could then be used for distribution to any part of the UC Santa Cruz campus through the campus water infrastructure, without any distinction as to whether the water service supplied new campus development or parts of the campus outside City jurisdiction (see *Bohman*, *supra*, 54 Cal.2d at pp. 794-795); and (2) the section 56133, subdivision (e)(4) exemption from requesting LAFCO approval for extended service under section 56133, subdivision (a) applies because it is undisputed that the City provided extended water service to the UC Santa Cruz campus before 2001; and (3) therefore LAFCO is not an indispensable party whose joinder is required under Code of Civil Procedure, section 389, subdivision (a).

We further conclude that the Regents' motion for summary adjudication of the second cause of action for breach of contract—specific performance must be denied because the Regents failed to establish as a matter of law that the City has breached the water service terms of the 1962 and 1965 Agreements.

Having reached these conclusions, we will reverse the September 30, 2022 judgment dismissing the Regents' complaint with prejudice and entering judgment for the City. We will remand the matter to the trial court with directions to: (1) vacate the September 30, 2022 order denying the Regents' motion for summary adjudication and granting the City's motion for summary adjudication; (2) enter a new order granting the Regents' motion for summary adjudication of the first cause of action for declaratory relief and denying the Regents' motion for summary adjudication of the second cause of action for breach of contract-specific performance; (3) enter a new order denying the City's motion for summary judgment, or, in the alternative, summary adjudication of the first cause of action for declaratory relief and granting summary adjudication of the second cause of action for breach of contract—specific performance; and (4) enter a new order granting declaratory relief as follows: Under the terms of the agreement executed

38

on January 8, 1962, and the agreement executed on February 8, 1965, between the Regents of the University of California and the City of Santa Cruz, the City of Santa Cruz is obligated to provide water service to the boundaries of the University of California campus through the City's existing water lines, which may then be used for distribution to any part of the University of California, Santa Cruz campus, including new campus development and those parts of the campus outside the City's jurisdiction, through the campus water infrastructure.

## V.  DISPOSITION

The September 30, 2022 judgment is reversed.  The matter is remanded to the trial court with directions to:  (1) vacate the September 30, 2022 order denying the Regents' motion for summary adjudication and granting the City's motion for summary adjudication; (2) enter a new order granting the Regents' motion for summary adjudication of the first cause of action for declaratory relief and denying the Regents' motion for summary adjudication of the second cause of action for breach of contract-specific performance; (3) enter a new order denying the City's motion for summary judgment, or, in the alternative, summary adjudication of the first cause of action for declaratory relief and granting summary adjudication of the second cause of action for breach of contract—specific performance; and (4) enter a new order granting declaratory relief as follows:  Under the terms of the agreement executed on January 8, 1962, and the agreement executed on February 8, 1965, between the Regents of the University of California and the City of Santa Cruz, the City of Santa Cruz is obligated to provide water service to the boundaries of the University of California campus through the City's existing water lines, which may then be used for distribution to any part of the University of California, Santa Cruz campus, including new campus development and those parts of the campus outside the City's jurisdiction, through the campus water infrastructure.

The parties are to bear their own costs on appeal.

39

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:



_____

GREENWOOD, P. J.



_____

WILSON, J.



***The Regents of the University of California v. City of Santa Cruz***
**H050528**